SHREVEPORT LAUNDRIES, Inc., v. MASSACHUSETTS BONDING & INS. CO.*

No. 4341.

Court of Appeal of Louisiana. Second Circuit.

June 29, 1932.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for appellant.

Milner & Porteous, of New Orleans, Thatcher, Browne, Porteous & Myers, of Shreveport, and John T. Campbell, of Minden, for appellee.

PALMER, J.

This is a suit on an indemnity bond to recover $568.73, for an alleged shortage in the account of one of plaintiff's employees, under the terms of which said bond the defendant warranted a faithful accounting by the said employee to plaintiff of all funds collected by him. In addition to the amount of the alleged shortage, plaintiff also sues to recover certain penalties and attorney's fees, under the provisions of Act No. 37 of the Legislature of Louisiana for the year 1921 (Ex. Sess.), on the allegation that defendant failed to settle said obligation within the time required by the statute.

In effect, plaintiff alleged that during the early part of February, 1931, it employed one Herschel Carroll as a driver and solicitor, whose duties were to solicit laundry, dry cleaning, and other similar work, and bring the work to the laundry, and thereafter to return it, collect for it, and then account to plaintiff each week for such collections, deducting each time the amount of the commission to which he was entitled.

Plaintiff further alleged that said Carroll furnished the bond on which this suit is based, which guarantees the faithful performance of his obligations under his contract with plaintiff; that said Carroll was short in his account with plaintiff for the week ending June 13, 1931, in the said sum of $568.73; and that, complying with its obligations under the terms of said bond, plaintiff promptly notified the defendant company of the said shortage, giving said notice through the company's local agents.

Plaintiff further alleged that after the defendant company, through its local agent and attorney, made a thorough examination and investigation of the account of the said Carroll, they agreed that the shortage existed as alleged, and later issued to plaintiff, through its New Orleans agents, a draft drawn on defendant company at Boston, Mass., covering the amount of the said shortage, at which time plaintiff surrendered to defendant the said bond; and that payment of said draft was refused by defendant company.

Plaintiff further alleged that more than sixty days elapsed from the time it furnished to defendant the required information, as provided for under the terms of said bond and under the law in the case, before this suit was filed, and by virtue of that fact, claimed the penalties, attorney's fees, etc., provided for under the act.

Defendant first filed a prayer for oyer, asking that an itemized statement of the account of said Carroll, during the time he was in the employment of plaintiff company, be filed before it should be required to answer. Plaintiff answered the rule asserting that it had previously mailed to the defendant company the itemized statement requested. It further answered that, prior to July 1, 1931, it furnished to defendant company's representatives in Shreveport, including its attorneys, complete and detailed information concerning the alleged shortage, and that in August, 1931, it sent a complete detailed copy of the account of said Carroll for the month of June, 1931, prior to which time he had not been short in his accounts, but that it attaches to its said answer a complete itemized statement of the account of said Carroll during the entire period of his employment.

Defendant then answered, denying liability under the bond sued on; it admitted that its local agent was notified of the shortage soon after it was discovered; it admitted also that a draft was drawn on it for the amount of the alleged shortage by an insurance agency in the city of New Orleans, but averred that the draft was drawn without its authority and that it refused to pay it when it was presented. It admitted that at the time the said draft was issued, plaintiff surrendered the said bond.

Defendant further admitted that more than sixty days elapsed after plaintiff furnished it with notice of the alleged shortage before this suit was filed, but it denied that it ever received an itemized statement of the alleged shortage until September 26, 1931, only twenty-two days before this suit was filed.

Defendant further alleged that the provisions of the bond sued on were not complied with by plaintiff in the following particulars:

(a) That a complete settlement was not had each week between plaintiff and the said Carroll, as required by the bond;

(b) That said Carroll actually paid to plaintiff all of the moneys collected by him for their account during the week ending June 13, 1931, but that said collections were credited to other accounts kept by plaintiff with said Carroll and against his will;

(c) That notice of default was not delivered to defendant at its home office in the city of Boston, Mass., within ten days after the discovery of the shortage, as required by the bond.

Defendant further alleged that plaintiff sold to the said Carroll one Chevrolet truck and that he made a cash payment of $150 on another truck that was delivered to him; that plaintiff required said Carroll to make weekly payments on these trucks out of the money collected by him, against the protest of the said Carroll; that all of the money the said Carroll collected for laundry was turned over to plaintiff, but that plaintiff refused to credit the same on the account for.which the bond sued on was intended to cover, but, instead, credited it to the truck account; that to require defendant to pay this claim will, in effect, compel it to pay the balance due by said Carroll on the purchase price of said trucks.

In the alternative, defendant averred that if the court should hold that Carroll acquiesced in the imputations so made, that such imputations were made without its knowledge or consent and were not binding on it; that said payments should have been credited to the agency account of the said Carroll.

On these issues the case was tried in the district court, resulting in a judgment in favor of plaintiff in the sum of $568.73, the amount of the alleged shortage, with interest at the rate of 5 per cent. per annum from August 13, 1931, until paid. The demands of plaintiff for damages and attorney's fees were rejected. Plaintiff has appealed from that part of the judgment which rejected its demands for penalties and attorney's fees. Defendant has not answered the appeal. There is, therefore, nothing before this court except the question of plaintiff's claims for penalties and attorney's fees, as provided by the terms of Act No. 37 of the Legislature of Louisiana for the year 1921 (Ex. Sess.).

### Statement of Case.

Herschel Carroll worked for the Shreveport Laundries, Incorporated, in the capacity of a laundry solicitor or driver. His territory was the city of Longview, Tex., and the surrounding vicinity. In the beginning of his employment, he operated a truck owned by plaintiff and received a regular commission on the business which he secured for the company. Later, he made a contract with plaintiff under which he furnished his own trucks, after which his commission was greatly increased.

Carroll would make a settlement with plaintiff each week, his account being handled in this manner: He was charged with the amount of undelivered laundry carried over from the preceding week, plus the laundry work for the current week. He was then credited with the amount of undelivered laundry work on hand, which would naturally be carried over as a balance into the next week; also he was credited with overcharges and with his commission. The difference between the amount charged against him and the amount credited to his account was the amount due the laundry, so he would pay this amount in cash or by check.

On the week ending June 13, 1931, Carroll advised plaintiff that he was unable to pay the cash that was due it on the settlement for that week, thereupon plaintiff immediately had Carroll's account checked and audited, at which time a shortage of $568.73 was revealed.

Plaintiff at once notified the Mayfield-Jones Insurance Agency, Inc., the Shreveport agents of the defendant company, of the existence of this shortage. In turn, Mayfield-Jones Insurance Agency, Inc., communicated this information to Ledbetter & Page, Inc., the general agents of the defendant company for the state of Louisiana. Ledbetter & Page, Inc., referred the controversy to Messrs. Thatcher, Browne, Porteous & Myers, attorneys of Shreveport, and Mr. John T. Carpenter, of that firm, took the matter in hand, acting as the local attorney of the defendant company. Mr. Carpenter at once, in company with Mr. Jones, of the Mayfield-Jones Insurance Agency, Inc., made an investigation of plaintiff's alleged claim of a shortage in Carroll's account, after which they entered into an agreement with Carroll and plaintiff whereby Carroll was to repay plaintiff the shortage in weekly payments. In the meantime, plaintiff agreed that it would not press its claim against the defendant, so long as the payments thus agreed upon were promptly made.

It was agreed between plaintiff and the said parties representing the defendant company that any delays encountered by virtue of this attempted amicable adjustment should not prejudice the rights of either party. As evidence of the agreement, Mr. Carpenter wrote Messrs. Milner & Porteous, New Orleans attorneys, representing the defendant company, the following letter:

"Messrs. Milner & Porteous, Attorneys,
"American Bank Bldg.,
"New Orleans, Louisiana.
"Re: Herschel Carroll—
"Shreveport Laundries, Inc.
"Bond No. 1250—H. O. No.
"F-164182.

"Gentlemen:
"Yesterday the writer had a meeting between Mr. J. P. Jones, representing the Mayfield-Jones Insurance Agency and Mr. Herschel Carroll and Mr. Goldstein, President of the Shreveport Laundries, Inc., in the office of the Laundry.

"After going into the matter thoroughly of the shortage of Mr. Carroll in his account to the Shreveport Laundries, a working agreement was reached that we believe will help work out this claim without our Insurance Company having to put out any money. This agreement was substantially as follows:

"Mr. Herschel Carroll has agreed to repay the shortage to the Shreveport Laundries at

the rate of $12.50 each Saturday night beginning July 4th, for four consecutive weeks, after which he is to pay $20.00 for the next two Saturdays, and $25.00 per Saturday thereafter until this shortage has been paid in full. This method of payment has been agreed on because Mr. Carroll has considerable equity in five delivery trucks, a number of payments of which will be paid out in the next four or six weeks. Mr. Goldstein, representing the Laundry, has agreed that he will not press this claim so long as the payments are met by Mr. Carroll in accordance with this agreement. It was further agreed that no parties to the above agreement were waiving any rights in the premises by reason of this amicable working agreement. In other words, if Mr. Goldstein presses his claim against our Company in the future, because Mr. Carroll does not make these payments, we are not to take advantage of the fact that he is not filing the claim in the time as requested by our policy, because as a fact, Mr. Goldstein has already filed his claim. Neither are we to sacrifice any right we might have to refuse payment of the claim, if our investigation discloses that we have a defense. It was further understood that if Mr. Carroll did not make these weekly payments promptly that Mayfield-Jones would be notified at once in order that we might protect our rights.

"Very truly yours,

"Thatcher, Browne, Porteous & Myers,

"By John T. Carpenter.

"C. C.

"Shreveport Laundries, Inc.,

"Crockett Street,

"Shreveport, Louisiana."

Notwithstanding the agreement whereby Carroll was permitted to settle the shortage by weekly payments, he failed to comply with the agreement, so immediately after his default, plaintiff notified Mayfield-Jones Insurance Agency, Inc., to that effect, which was in keeping with the agreement had with Messrs. Jones and Carpenter, as Mr. Carpenter's letter shows. Upon these developments, Mr. Jones, with Mr. Frost, the auditor of plaintiff company, again checked Carroll's account, and thereupon the Mayfield-Jones Insurance Agency, Inc., requested Ledbetter & Page, Inc., to issue a draft to plaintiff for the amount of the shortage, which draft was promptly issued.

According to the testimony of Mr. Jones given upon the trial of the case, this was the manner in which all claims against the defendant are handled; that is, his company investigated the claim and, if approved, Ledbetter & Page, Inc., are notified and they issue a draft to cover. This draft was issued September 2, 1931. It was deposited for collection by plaintiff in its bank, and when presented to the defendant at its home office, payment was refused. At the time the draft was received, plaintiff, considering the claim settled, surrendered the bond sued on. After the draft was returned unpaid, considering an error had occurred, plaintiff again deposited the draft and had it forwarded to the Federal National Bank of Boston, for payment, which was again refused. While the draft was returned, the bond was not returned.

Subsequently, considerable correspondence took place between the Boston attorneys of the defendant and the attorneys for plaintiff, but no agreement was reached for the settlement of the claim; therefore this suit was filed on October 6, 1931, which was more than four months after the original notice of the shortage had been given the Mayfield-Jones Insurance Agency, Inc., of Shreveport. It was also some seventy-eight days from the time that Messrs. Jones and Carpenter had the agreement with plaintiff and Mr. Carpenter wrote his letter to Messrs. Milner & Porteous, before the suit was filed.

Plaintiff claims that the reason it did not promptly forward to the defendant company the itemized statement required by Act No. 37 of 1921 (Ex. Sess.), was because Mr. Jones, whose firm is the local agent of the defendant, and Mr. Carpenter, one of the attorneys for defendant company, had examined Carroll's account in detail and had concluded that the shortage actually existed, as claimed, and had requested the New Orleans agents of the defendant company to issue a draft to cover the shortage, and that such draft was actually issued and the bond surrendered.

Mr. August Goldstein, president of the plaintiff company, gives the following testimony bearing upon this question:

"Q. You have already examined the letter written by Mr. Carpenter to Messrs. Milner & Porteous, dated July 1, 1931, I believe before that time you had filed your claim?

"A. On June 15th—

"Q. Had you up to that time had occasion to consult your attorneys?

"A. We didn't consult them in regard to bringing any suit, or with the idea of bringing suit, but merely had Mr. Frost bring all papers to your office to see if everything was in order—but at that time I was under the impression, and Mr. Jones assured me the case would be settled promptly.

"Q. That was subsequent however to this agreement?

"A. That was before the agreement, what you mean by subsequent—

"Q. It was after the agreement or before the agreement?

"A. Since I reported the shortage, before Mr. Frost took the bond and contract to your office, I told him to take them to your office to see if everything was in order, I didn't anticipate any legal action at the time, I merely wanted to be on the safe side.

"Q. Why did you think the claim would be settled?

"A. Mr. Jones told me they would settle the claim right away.

"Q. After Mr. Carpenter's agreement which is evidenced by this letter, why did you not immediately thereafter send the insurance company a detailed itemized statement as called for by the bond?

"A. For the reason that I was under the impression that if for any reason Carroll didn't make those payments which he agreed to work out, the insurance company would make immediate settlement.

"Q. That was in reliance—

"A. Of that agreement."

On cross-examination, Mr. Jones, of the Mayfield-Jones Insurance Agency, Inc., gives the following testimony bearing upon this question:

"Q. And as I understand, on the claims you did have, you would send them down to New Orleans one day to Mr. Phillips and the next day get back the draft?

"A. If we mailed the claim out of the office today, they get the claim tomorrow, and draft would be issued the same day and the following day have it back, always had three day service out of New Orleans.

"Q. Those drafts were always paid in prior cases?

"A. Yes, sir.

"Q. This is the only case in which you know they were not paid?

"A. Yes—

"Q. You were asked if you had received from Mr. Phillips any draft in prior cases involving liability similar to this, you stated no, have you had any other liability claim against the Massachusetts Bonding & Insurance Company, any case similar to this before this one.

"A. No bond case.

"Q. This is the only bond case you ever had?

"A. Yes, sir."

Plaintiff filed a plea of estoppel, alleging that defendant is estopped to claim that it had not received the detailed statement of Carroll's account, as required by Act No. 37 of 1921 (Ex. Sess.), for the reasons shown by the facts hereinabove set forth.

### Opinion.

Although the issues of this case are restricted to the question of penalties and attorney's fees, as provided for under Act No. 37 of 1921 (Ex. Sess.), yet we have deemed it advisable to make at length a statement of the case, because the facts covered by the statement must be taken into consideration in passing upon plaintiff's plea of waiver and estoppel.

Were the requirements of the act met, requiring plaintiff to furnish defendant information concerning the shortage?

Defendant resists the payment of penalties and attorney's fees on two grounds, viz.:

1. That the detailed information concerning the amount of the loss was not forwarded defendant *by registered mail* sixty days prior to the filing of this suit;

2. That defendant had a just and reasonable defense.

Plaintiff meets those defenses as follows:

That the detailed information called for by the statute was furnished defendant, through its representatives, who called for it in person and took it from plaintiff's records, and that defendant had no valid defense to the merits of plaintiff's demands.

We shall consider these defenses in the order stated.

Act No. 37 of 1921 (Ex. Sess.), is a statute that requires bond companies to settle all claims for shortage, defalcations, and misappropriation of funds by those for whom they are surety, within sixty days after notice has been made on the bond company. The act provides penalties for the failure of the bond company to pay the shortage within the time specified. Under the provisions of the act, the employer must notify the bond company, in accordance with the requirements of the bond, of the alleged shortage, and that notice must be followed as soon as possible, *by registered mail*, with detailed information concerning the amount of the loss sustained. Upon receipt of that notice, it is the duty of the bond company to immediately proceed to investigate the claim, and if it is a legal and just one, it must be paid up to the amount of the bond, within sixty days after receipt of the notice giving the detailed information concerning the loss.

The act further provides that if the bond company fails to pay the amount for which it is responsible, within sixty days after it has received the said detailed statement, such bonding company shall be liable to pay, in addition to the amount of the loss, 3 per cent. per month, with a minimum of 12 per cent. and a maximum of 50 per cent. as damages, on the total of the loss, together with all reasonable attorney's fees for the prosecution and collection of such loss.

█ True enough, it is a well-settled principle of law that the penal provisions of a statute are to be strictly construed, that is, a party claiming a penalty must show that he has complied with the requirements of the statute before he is entitled to it. But it is obvious that the notice required by this statute to be given the bonding companies is for

their benefit only. They are such provisions as are personal to the bond companies and can be waived.

Article 11 of the Civil Code of Louisiana, dealing with waivers, provides:

"Individuals can not by their conventions, derogate from the force of laws made for the preservation of public order or good morals.

"But in all cases in which it is not expressly or impliedly prohibited, they can renounce what the law has established in their favor, when the renunciation does not affect the rights of others, and is not contrary to the public good."

It is therefore clear that if the defendant company chose to do so, it had a perfect right to waive the notice which Act No. 37 of 1921 (Ex. Sess.) provides it should have. Furthermore, requirements of laws may be satisfied by acts amounting to a substantial compliance with such requirements. In the act supra, it is provided that after the preliminary notice of the shortage is given the bond company, detailed information concerning the amount of loss sustained must be furnished the bond company *by registered mail*, yet it would hardly be questioned that it would be a substantial compliance with such requirements if the notice was in fact handed in person to some representative of the company in the office of the company. Any other acts done whereby the company obtained this detailed information would appear to meet the requirements of the act.

Our courts have held that the letter of the law, though unambiguous, may be disregarded with the honest intention of seeking the spirit, and when leading to an absurd conclusion, must be rejected for one that is reasonable. Cox v. Williams, 5 Mart. (N. S.) 139, 141; Buhol v. Boudousquie, 8 Mart. (N. S.) 425, 430; Ardry v. Ardry, 16 La. 264; Bermudez v. Union Bank, 7 La. Ann. 62; State v. Wiltz, 11 La. Ann. 439; Interdiction of Bothick, 44 La. Ann. 1037, 11 So. 712; State v. Fairbanks, 115 La. 457, 39 So. 443.

In the case of Shreveport Gas, Electric Light & Power Co. v. Assessor of Caddo Parish, 47 La. Ann. 67, 16 So. 650, 651, the Supreme Court of Louisiana said:

" * * * In order to ascertain the true meaning of a statute, the reason and spirit of it should be considered, and also the cause which superinduced its enactment."

In the case of McElveen v. Goings, 116 La. 977, 41 So. 229, 114 Am. St. Rep. 574, the Supreme Court of Louisiana said that "courts 'will not apply the rule of strict construction with such technicality as to defeat the purpose of ascertaining the true meaning and intent of the statute.'"

As the facts in this case show, plaintiff timely notified the local agent of the defendant company of the existence of this short-age. Under the terms of the act, this notice could be served upon the local agent, as well as upon the company at its home office. As we have stated, very soon following this notice, Mr. Jones, of the Mayfield-Jones Insurance Agency, Inc., local agents of the defendant company, with Mr. Carpenter, a member of the law firm of Thatcher, Browne, Porteous & Myers, called at the office of the plaintiff company for the purpose of discussing this shortage. At that time, they had available the books of the company, and from their own examination, made in their own way, they undoubtedly concluded that the alleged shortage existed, because they at once effected an agreement with Carroll, the employee of the plaintiff company who had committed the defalcation, acceptable to plaintiff, whereby the shortage was to be paid by Carroll in weekly payments. If that inspection or investigation of plaintiff's books by Messrs. Jones and Carpenter was not sufficient, certainly, at a later date they did make such inspection with Mr. Frost, the company's auditor, who was called in to check over the matter with them. That occurred in this way:

After Carroll failed to live up to his part of the agreement by making the weekly payments agreed on, Mayfield-Jones Insurance Agency, Inc., was immediately notified of that failure. Soon after that notice, Mr. Frost, plaintiff's auditor, with the representatives of defendant company, checked Carroll's account, after which checking defendant's said representatives agreed that the alleged shortage actually existed, and advised the New Orleans agent to that effect and requested that a draft be issued in favor of plaintiff in settlement of the shortage.

Following the custom that had prevailed in other matters of settling claims—not one of this particular kind, however—the New Orleans agents of the defendant company issued a draft on defendant, at Boston, Mass., in favor of plaintiff, and at the same time took up the bond which had been issued to plaintiff to cover Carroll's account. As stated, while payment of that draft was refused, yet the company retained the bond.

Thus it will be seen that the company did not wait to receive, *by registered mail*, the detailed statement required by Act No. 37 of 1921 (Ex. Sess.), but sent their agent to the office of plaintiff company where they had access to, and did examine, the records of plaintiff company dealing with the account of Herschel Carroll. Certainly such examination revealed all details that the notice provided for in this section of the act called for. Plaintiff, had it made up such a detailed statement, as it afterwards did, would have taken it from the very records which were submitted to the defendant's agents and examined by them. *In our opinion, what was done in this case amounted to a substantial*

compliance with the requirement of the statute. If not, it certainly constituted a waiver of the detailed statement plaintiff was required to furnish the bond company.

As stated, it is the detailed information which the statute required that the defendant should receive, and while the statute points out that such statement shall be forwarded to the defendant, *by registered mail*, yet, as we have already held, the defendant had a perfect right to waive that specified requirement and; in our opinion, it did so in this case when it sent its agents to the office of plaintiff company and secured the same information first hand from an inspection of plaintiff's records. This all took place more than sixty days prior to the filing of this suit.

In view of these conclusions, we hold that defendant is estopped to complain of plaintiff's failure to furnish that notice in the particular way pointed out in the act.

Were the defenses actually urged based upon just and reasonable grounds?

Defendant claims that even though it waived the registered notice of the detailed statement above referred to, it cannot be held amenable for the penalties and attorney's fees, if it had a just and reasonable defense to plaintiff's suit. The act does provide that "the penalty hereinabove provided shall apply, except when the court shall include in its judgment a finding that the defense was upon just and reasonable grounds." Section 3. As a matter of fact, the lower court rejected the defenses.

Defendant urges that, inasmuch as Carroll told them that the facts alleged in their answer are true to the effect that the funds he turned in to the plaintiff company were improperly imputed, it had a just and reasonable defense in that particular, and submitted that defense in good faith, and even though it failed to sustain it on trial in the court below, it should be relieved of paying the penalties and attorney's fees.

We do not think that is a correct interpretation of the provisions of the act just quoted, but even so, as a matter of fact, Carroll told the said representatives of defendant company that he was short in his accounts and that the amount claimed was correct—in fact, he made an affidavit to that effect—of which they undoubtedly had knowledge. Furthermore, they helped Carroll work out an agreement with the plaintiff company whereby he was to repay that shortage in weekly payments. So, in the face of these facts, it can hardly be seriously argued that the defense based upon that ground is well founded.

We think the plaintiff is entitled to the penalties and attorney's fees provided for in the act.

The judgment of the lower court is therefore amended by allowing plaintiff 3 per cent. per month, from October 1, 1931, on the sum of $568.73, until this judgment is settled; and in addition thereto, plaintiff be and is hereby awarded judgment for attorney's fees in the sum of $200. As thus amended, the judgment is affirmed; defendant to pay all costs incurred in both courts.